**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jesus Ricardo Grijalva Alvarez, | No. CV-18-01726-PHX-DGC |
| Petitioner, | **ORDER** |
| v. | |
| Nancy Teresa Reyes Rosas, | |
| Respondent. | |

Petitioner Jesus Ricardo Grijalva Alvarez has filed a "Verified Petition for Return of Child Under the Hague Convention." Doc. 1. Respondent Nancy Teresa Reyes Rosas opposes the petition. The Court held an evidentiary hearing on August 16, 2018. Petitioner and Respondent, who speak only Spanish, testified through interpreters, as did a number of other witnesses. Spanish language documents were received in evidence with their English translations. After considering the evidence and the relevant law carefully, the Court will grant the petition.

**I.  Background.**

Petitioner and Respondent are the parents of a four year old daughter, referred to in this order as "F," and a son who is almost two years old, referred to in this order as "J." Petitioner and Respondent began living together in Nogales, Mexico before F's birth, and later were married. Although Petitioner worked as a truck driver in the United States several days each week, Petitioner and Respondent maintained a home in Nogales.

Respondent came to the United States for the births of F and J, but returned to Mexico within a week after the births.

The relationship between Petitioner and Respondent became strained after J was born on September 21, 2016. Respondent claims that this was because Petitioner had an extramarital affair. Petitioner moved out of their Nogales house sometime after J's birth, and filed for divorce in Mexico. Petitioner maintained text and phone contact with Respondent and the children, and provided some direct financial support, until April 2017. In July 2017, Respondent moved to Phoenix, Arizona with F, J, and her 13 year old son from a previous relationship. She and the children now live with Respondent's aunt in Phoenix, and intend to remain in the United States. Petitioner asks the Court to apply the Hague Convention and order that F and J be returned to Mexico until custody rights can be resolved in the divorce action still pending in the Mexican courts.

**II.    The Hague Convention and ICARA.**

The Hague Convention on the Civil Aspects of International Child Abduction seeks to deter parents from moving children across international borders to gain the upper hand in custody disputes. *See Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010). With a few narrow exceptions, a court must return the children to their country of habitual residence so that the courts of that country can determine custody. *Id*. Both the United States and Mexico are signatories to the Hague Convention and are Contracting States within its meaning. Congress enacted the International Child Abduction Remedies Act, 42 U.S.C. § 9001 *et seq.* ("ICARA"), to implement the Convention.

The objectives of the Convention are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Convention, Art. 1 (reprinted at 51 Fed. Reg. 10,494). "An action under the Convention and ICARA is not an action to determine the merits of custody rights[.]" *Koch v. Koch*, 450 F.3d 703, 711 (7th Cir. 2006).

Under Article 3 of the Convention, the Court must order the return of a minor child

to the child's country of habitual residence if the child was wrongfully removed from that country. Removal is wrongful where:

> (a) it is in breach of rights of custody attributed to a person . . . under the law of the state in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, Art. 3.

Thus, to invoke the Convention, Petitioner must prove by a preponderance of the evidence that F and J were habitually resident in Mexico immediately before they were removed in July 2017, and that he was actually exercising his parental rights at the time of their removal.[1] Respondent can defeat application of the convention if she shows that (1) Petitioner was not exercising his custody rights at the time of removal (by a preponderance of the evidence), (2) return of the children to Mexico would present a grave risk of physical or psychological harm to the children (by clear and convincing evidence), or (3) return of the children would present a grave risk of placing the child in an intolerable situation. Convention, Art. 13; 42 U.S.C. § 9003(e). ICARA characterizes these exceptions as "narrow." 42 U.S.C. § 9001(a)(4).

### III. Analysis.

The Court will first consider whether Petitioner has shown that the children were habitually resident in Mexico immediately before their removal and that he was actually

---

[1] Respondent has not challenged Petitioner's custody rights under Mexican law, the first requirement of Article 3(a). These rights under Mexican law, referred to as "patria potestas," recognize a parent's right to care for the child, reside with the child, and provide for the child's necessities. The rights belong to both parents. *Ramirez v. Buyauskas*, No. 11-6411, 2012 WL 606746 (E.D. Pa. Feb. 24, 2012); *March v. Levine*, 136 F. Supp. 2d 831, 842 (M.D. Tenn. 2000); Antoinette Sedillo Lopez, *International Law – U.S./Mexico Cross-Border Child Abduction – The Need for Cooperation*, 29 N.M. L. Rev. 289, 297 (1999).

exercising parental rights at the time of removal. The Court will then address Respondent's defenses.

## A. Habitually Resident.

Habitual residence is not defined in the Convention or ICARA. Although the discussion of habitual residence varies from case to case, the Ninth Circuit has provided this guidance:

> In the Ninth Circuit, we look for the last shared, settled intent of the parents in an attempt to determine which country is the locus of the children's family and social development. [We require] that there be a shared intent to abandon the prior habitual residence, unless the child consistently splits time more or less evenly between two locations, so as to retain alternating habitual residences in each. Once intent is shown, [we require] an actual change in geography combined with an appreciable period of time to establish a change in habitual residence.

*Valenzuela v. Michel*, 736 F.3d 1173, 1177 (9th Cir. 2013) (quotation marks and citations omitted).

Respondent testified that she and Petitioner always intended to move the children from Mexico to the United States and to raise them in this country. Petitioner disagreed, testifying that they did not intend to move to the United States permanently. The Court finds it difficult to determine who is telling the truth. Both parties were earnest and credible in their testimony. The Court therefore looks to other facts to help make this decision.

Petitioner is a legal permanent resident of the United States who works as a truck driver in this country. Before meeting Respondent, he lived at times with his mother in California, but, as his mother testified, most of the time he lived in his truck. Petitioner moved in with Respondent in Nogales, Mexico when they began their relationship. Petitioner and Respondent were married in Mexico and lived together in that country. Although F and J were born in Phoenix, the evidence shows that Respondent came to the United States a few weeks before each birth and returned to Nogales within a week after.

From September 2016 to July 2017, when the children were removed, Respondent and the children lived in Nogales. This was virtually all of J's life up to that time, and the evidence suggested that F resided in Mexico for essentially all of her life up to that time as well. Respondent's 13 year old son from a prior relationship testified that he lived with his mother and attended school in Nogales prior to his mother's move to Arizona in July 2017.

Given these facts, it is clear that Nogales, Mexico was the "locus of the children's family and social development" before their move to the United States. *Valenzuela*, 736 F.3d at 1177. Although Respondent claims that she and Petitioner always intended to relocate to the United States, it appears that the "last shared, settled intent of the parents" – during the years and months immediately before the removal – was to live in Nogales. *Id.* The Court is not persuaded by the evidence that Petitioner and Respondent had a "shared intent to abandon the prior habitual residence." *Id.* Moreover, even if such an intent existed, the Ninth Circuit requires "an actual change in geography combined with an appreciable period of time to establish a change in habitual residence." *Id.* There was no such change before Respondent moved the children to Phoenix.

Thus, although it is clear that the family visited the United States from time to time and that the children are citizens of this country by virtue of their births here, the Court concludes that their habitual residence "immediately before the removal" – which is the time period identified by Article 3 of the Convention – was Mexico.[2]

**B. Was Petitioner Actually Exercising His Parental Rights?**

The Ninth Circuit has held that Petitioner's burden in proving that he was actually exercising parental rights is "minimal." *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009). As the Court of Appeals noted, "requiring a petitioning party to meet a high bar in demonstrating the actual exercise of custody rights contradict[s] the Convention's

---

[2] Respondent presented evidence that Petitioner is a permanent lawful resident in the United States, works in this country, files tax returns here, and claims on his tax returns and in other documents that his residence is his mother's house in California. The critical question, however, is where the children were habitually resident before their removal, not where Petitioner was resident. And the Court cannot conclude that Petitioner's substantial ties with the United States overcome the fact that he moved to Nogales to be with Respondent and remained there through their marriage and the birth of their two children. Petitioner testified that he continues to live in Nogales at this time.

objective to reserve custody determinations for the country of habitual residence." *Id.* The Ninth Circuit adopted this statement of Petitioner's burden:

> [I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention *short of acts that constitute clear and unequivocal abandonment of the child.* Once it determines that the parent exercised custody rights *in any manner*, the Court should stop – completely avoiding the question whether the parent exercised the custody rights well or badly.

*Id.* (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996) (emphasis added)). Other circuits have also adopted this standard. *See*, *e.g.*, *Rodriguez v. Yanez*, 817 F.3d 466, 472 (5th Cir. 2016); *Walker v. Walker*, 701 F.3d 1110, 1121 (7th Cir. 2012); *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007); *Baxter v. Baxter*, 423 F.3d 363, 369-70 (3d Cir. 2005).

Respondent contends that Petitioner left their relationship for another woman in the fall of 2016. Although it is not clear when he moved out of Respondent's house, she testified that he left her by the time she returned to Mexico from the birth of J in late September. Respondent testified that Petitioner visited the children occasionally in the following months, usually less than once per month, and only for one or two hours at a time. She testified that he provided some financial support through the end of March 2017, but that she also had to rely on her family for her financial needs.

Respondent focused particular attention on an incident that occurred on April 2, 2017. She testified that Petitioner spent several hours with F that day and, upon returning F to Respondent's home, engaged in a verbal altercation with Respondent. Respondent testified that Petitioner violently shook the gate of her house, threw rocks at her house, threatened to kill her, and stated that he would let her and the children "starve." After this date, according to Respondent, Petitioner had no contact with her or the children. He did not visit, call, or text, and he provided no financial support.

Desperate because of the lack of financial support, Respondent testified that she moved the children to Arizona in July of 2017, where she lives with her aunt. Respondent

further testified that Petitioner has made no effort to contact her or the children in the many months since she moved to Arizona, and has provided no financial support. On the basis of these facts, Respondent contends that Petitioner was not actually exercising his parental rights when she removed the children from Mexico in July 2017.

Petitioner testified that he left Respondent in December 2016 due to problems in their marriage. He testified that he thereafter texted her regularly, spent time with the children, and provided financial support. Petitioner placed in evidence photographs of him with F and J as well as bank statements and text messages showing contact with and financial support for Respondent through March 2017.

Petitioner testified that he commenced divorce proceedings in a Mexican court, and placed the divorce petition, dated February 14, 2017, in evidence. Ex. 22. He also placed in evidence three certificates of attempted service on Respondent, each of which states that service was attempted on Respondent at her house in Nogales and was unsuccessful.[3] Exs. 23-25. Further, Petitioner placed in evidence documents showing that he has made child support payments to the divorce court each month since the divorce proceeding was commenced. Ex. 26.

Petitioner disagrees with Respondent's version of the incident on April 2, 2017. He testified that he spent the day with F – but not with J because he was sick – and returned F to Respondent's house in the evening. He asked Respondent for information about the children that he needed for his tax returns, but she refused to provide it, closed the gate, and took F in the house.

Petitioner agrees that he stopped having direct contact with Respondent and the children after that date. He testified that his divorce attorney advised him not to have contact, explaining that, given Respondent's aggressive actions, further contact could result in her claiming abuse or filing a lawsuit against him.

---

[3] Petitioner also testified that he told Respondent repeatedly that he was filing for divorce. Respondent disagreed, testifying that she did not learn of the divorce until May of this year. There is no dispute, however, that Petitioner attempted to serve Respondent with the divorce papers several times at her home. Exs. 23-25.

- 7 -

The Court has difficulty determining who is telling the truth about the incident on April 2, 2017. Petitioner and Respondent gave contrary versions of the event and each presented an additional witness to support his or her version. The Court concludes, however, that resolving this credibility question is not necessary in deciding whether Petitioner was actually exercising his parental rights.

As noted above, the "actually exercising" requirement is minimal. Any effort to exercise parental rights is sufficient. Only a "clear and unequivocal abandonment of the child" is sufficient to find that a petitioner was not exercising parental rights. *Asvesta*, 580 F.3d at 1018. Such an abandonment of rights did not occur here.

Petitioner filed a divorce case in Mexico in which he specifically asserted his parental rights. The English translation of the petition shows that Petitioner sought shared legal custody of the children, with Petitioner being permitted to visit them any day of the week, to have them with him from 8:00 a.m. to 7:00 p.m. on Saturdays and Sundays, and to keep them overnight at his residence if he chose. Ex. 22. The petition further sought an order requiring Petitioner to pay 2,000 pesos per month for child support, to be deposited at the beginning of each month in a bank account designated by Respondent. *Id.* And Petitioner attempted unsuccessfully to serve Respondent with the divorce papers three times. Exs. 23-25. Petitioner made regular monthly child support payments to the Mexican court. Ex. 28.

None of these facts is disputed, and the Court concludes that they are sufficient to satisfy Petitioner's minimal burden. They show that he was attempting to exercise his parental rights at the time Respondent removed the children from Mexico. He had clearly asserted those rights in court, had attempted several times to serve Respondent, and was paying child support to the court. Although it is true that Petitioner did not attempt to see his children or provide direct financial support to Respondent between April 2, 2017 and July 2017, the Court cannot conclude that he unequivocally abandoned them when he was seeking to formalize his right to visit and support them through a formal judicial proceeding. Courts are "to liberally find 'exercise' whenever a parent with de jure custody

rights keeps, *or seeks to keep*, any sort of regular contact with his or her child[.]" *Friedrich*, 78 F.3d at 1065 (emphasis added). Petitioner was seeking to keep his parental rights through the divorce action.

"'Once it determines that the parent exercised custody rights *in any manner*, the Court should stop – completely avoiding the question whether the parent exercised the custody rights well or badly." *Asvesta*, 580 F.3d at 1018 (quoting *Friedrich*, 78 F.3d at 1066 (emphasis added)). The Court concludes that Petitioner has met his burden of proving by a preponderance of the evidence that he was actually exercising his parental rights when the children were removed from Mexico.[4]

### C. Grave Risk of Physical or Psychological Harm to the Children.

Return of F and J to Mexico is not required if Respondent shows that "there is a grave risk" that return would expose them "to physical or psychological harm." Convention, Art. 13(b). This exception is "'drawn very narrowly, lest [its] application undermine the express purposes of the Convention – to effect the prompt return of abducted children.'" *Goudin v. Remis*, 415 F.3d 1029, 1036 (9th Cir. 2005) (quoting 51 Fed. Reg. at 10,509). The risk must be "grave, not merely serious," *id.*, and must be established by clear and convincing evidence, 42 U.S.C. § 9003(e)(2)(A). The exception "is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Goudin*, 415 F.3d at 1035; *see also Cuellar*, 596 F.3d at 508.

As noted above, Respondent testified that Petitioner shook her gate violently, threw rocks at her house, threatened to kill her, and said she and the children could starve. She also testified that she is afraid to return to Mexico because she thinks Petitioner may harm her. Respondent's attorneys also argued that because Petitioner works as a truck driver in the United States, he does not have the capacity to care for his children in Mexico. And Respondent presented some evidence that Petitioner's jeep was seized at the border carrying weapons, but she provided no evidence to contradict Petitioner's testimony that he

---

[4] The Court also notes that Petitioner presented unrefuted evidence of a loving relationship with F and J, including several photographs of them together, testimony from his mother and sister, and evidence that he took them to visit his mother and other family members in the United States.

- 9 -

traded the jeep for another vehicle some time earlier and had no involvement with it at the time of its seizure.

The Court's task under the Convention is not to decide whether Petitioner is a suitable father or a good spouse, whether granting him custody of the children would be an appropriate decision, or whether the children would fare better with Respondent or in the United States. The Court's task is to determine whether returning F and J to Mexico would present a "grave risk" of physical or psychological harm to them. The word "grave" means "likely to produce great harm or danger." Webster's New Collegiate Dictionary (1981); *see also* Oxford English Dictionary ("giving cause for alarm").

The threats Respondent testified about were directed primarily at her, not the children. Other Hague Convention cases have recognized that even physical abuse toward a spouse is not the same as physical abuse or threats toward a child. *See Nunez Escudero v. Tice-Menley*, 58 F.3d 374, 375-78 (8th Cir. 1995) (denying defense where respondent alleged that she was physically, sexually, and verbally abused by her husband and treated as a prisoner by her husband and father-in-law); *Nunez v. Ramirez*, No. CV-07-01205-PHX-EHC, 2008 WL 898658, at *5 (D. Ariz. Mar. 28, 2008) (evidence that petitioner struck respondent several times not sufficient to show risk to the child); *Tabacchi v. Harrison*, No. 99C 4130, 2000 WL 190576 (N.D. Ill. Feb. 10, 2000) (although petitioner's behavior toward his wife was unacceptable, to qualify as grave risk of harm under the Convention the risk must be to the child). And Respondent testified during the hearing that she is willing to let Petitioner visit the children, suggesting that she does not fear he will harm them.

Further, Petitioner's divorce papers suggest that he is not asking to be granted physical custody of F and J. He instead seeks visitation rights. Thus, a return of F and J to Mexico would not necessarily result in them being placed in Petitioner's physical custody.

Courts have also recognized that many countries of habitual residence have the capacity to protect children, including Mexico. *See Friedrich*, 78 F.3d at 1068 ("[W]e acknowledge that courts in the abducted-from country are as ready and able as we are to

1 protect children. If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country's courts to respond accordingly."); *see also Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995).

Respondent has not met the high threshold of clear and convincing evidence that returning F and J to Mexico would present a grave risk of physical or psychological harm to them.

### D. Intolerable Situation.

This exception is also narrow. The State Department Regulations explain: "A review of deliberations on the Convention reveals that 'intolerable situation' was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an 'intolerable situation' is one in which a custodial parent sexually abuses the child." 51 Fed. Reg. at 10,510. Respondent presented no evidence of an intolerable situation that is separate from the evidence discussed above. For reasons already explained, her evidence does not show an intolerable situation.[5]

### IV. Conclusion.

The Court emphasizes what it is not deciding. The Court is not deciding who is the better parent, which location would be preferable for F and J, or who should have custody of the children. Nor is the Court ordering that physical custody of F and J be granted to Petitioner.

This ruling is narrow. The Court finds that Petitioner has made the showing required under the Hague Convention for a mandatory return of F and J to Mexico, and that Respondent has not established any of the narrow exceptions to the return mandate.

---

[5] At points in the briefing, Respondent suggested that Petitioner consented to or acquiesced in the move of the children to Phoenix, another exception under the Convention. *See* Convention Art. 13(a). Respondent presented no specific evidence in support of this exception, and the Court can find none. Although it might be argued that Petitioner's failure to contact or support the children after their removal to the United States constituted acquiescence, Petitioner's divorce filing, his efforts to serve Respondent with divorce papers, and his pursuit of this action under the Hague Convention show that he did not acquiesce in Respondent's relocation of the children to Phoenix.

Applying the law to the facts as accurately as it can, the Court concludes that it must grant the petition and order that F and J be returned to Mexico until the courts of that country can resolve custody issues.

**IT IS ORDERED** that the Petition (Doc. 1) is **granted**. Respondent shall return F and J to Mexico within 30 days of this order, and F and J shall remain in Mexico, with Respondent if she so elects, until the custody proceedings in the Mexican courts have been concluded.

Dated this 17th day of August, 2018.

_David G. Campbell_
David G. Campbell
Senior United States District Judge